UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| ALISON LYNCH, | : | |
| | : | |
| Plaintiff, | : | Hon. Dennis M. Cavanaugh |
| | : | |
| v. | : | **OPINION** |
| | : | |
| JO ANNE B. BARNHART, | : | Civil Action No.: 04-2374 |
| Commissioner of Social Security, | : | |
| | : | |
| Defendant. | : | |

<u>DENNIS M. CAVANAUGH, U.S.D.J.</u>

This matter comes before the Court on Plaintiff Alison Lynch's ("Plaintiff") appeal from the Commissioner of Social Security's ("Commissioner") final decision denying her request for Disability Insurance Benefits(DIB) under the Social Security Act ("the Act"). The Court has jurisdiction to review this matter under 42 U.S.C. § 405(g). For the reasons set forth below, the final decision of the Commissioner is remanded for further proceedings consistent with this Opinion.

**I.     Background**

Plaintiff, born on September 22, 1966, is a college graduate with computer training. She has worked as a computer programmer and a technical consultant. She alleges she had been disabled and unable to work since August 1, 2001.

**A.  Procedural History**

Plaintiff filed an application for DIB on March 6, 2000, alleging disability since July 1, 1999. The disability onset date was subsequently amended at her hearing to August 1, 2001. Her

application was denied initially and on reconsideration. Pursuant to Plaintiff's request, a hearing was held on March 4, 2003, before Administrative Law Judge ("ALJ") Ralph J. Muehlig, at which Plaintiff appeared with counsel and testified. ALJ Muehlig, in a decision dated March 21, 2003, found that Plaintiff was not disabled within the meaning of the Act and therefore not entitled to DIB. This became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review on March 26, 2004. Plaintiff filed this action on May 20, 2004.

**B. Factual History**

*1. Medical Records Before August 1, 2001*

a. Operation to Treat Endometriosis

On March 3, 2000, Plaintiff underwent an operative laparoscopy, lysis of dense pelvic adhesions, left ovarian cystotomy, laser vaporization of endometriosis, and chromotubation, dilatation, and curettage. (R. at 145.) The hospital report stated that Plaintiff, prior to the operation, had chronic pelvic pain, menorrhagia, and a left ovarian cyst. Id. The physicians found that her fallopian tubes were twisted. Id. Plaintiff was in stable condition after the operation. (R. at 147.)

b. Social Security Administration Disability Report

On July 18, 2000, Plaintiff completed a questionnaire for the Social Security Administration. (R. at 59-68.) She claimed that she suffered from panic attacks, depression, severe endometriosis, and a knee injury. (R. at 60.) She stated that her panic attacks sometimes made her unable to answer the phone and that there were days when she felt too physically weak and tired to do anything. Id. She also stated that she would cry for hours at a time. Id.

      c.    <u>Medical Reports of Dr. Robin Innella</u>

Pursuant to a request by a state agency, Dr. Innella provided treatment notes for the Plaintiff covering a period of approximately six weeks. (R. at 87-92.) On June 28, 2000, Dr. Innella indicated that Plaintiff had been experiencing pain in her right knee for the past couple of months. (R. at 92.) Plaintiff had full flexion and extension, and an x-ray of the knee was negative. <u>Id.</u> On July 19, a magnetic resonance imaging ("MRI") revealed meniscal tear. <u>Id.</u> On August 2, Plaintiff underwent arthroscopic surgery on her right knee. <u>Id.</u> On August 9, Dr. Innella stated that Plaintiff was healing well and was neurologically intact. <u>Id.</u>

      d.    <u>Psychiatric Report of Dr. Scott Aftel</u>

On October 21, 2000, Dr. Aftel completed a psychiatric report for a state agency, which covered Plaintiff's treatment sessions from November 15, 1999 to September 27, 2000. (R. at 93-99.) Dr. Aftel reported that Plaintiff experienced panic attacks, depression, and sleepwalking. (R. at 94.) At her last visit, Plaintiff appeared to be alert with coherent and relevant speech, intact memory, fair intellect, and fair judgment. (R. at 95.) She had neither suicidal ideation nor hallucinations. <u>Id.</u> Her concentration was limited to fair. <u>Id.</u> Dr. Aftel noted that Plaintiff suffered from sporadic panic attacks, which had a limited impact on her functioning. (R. at 96.) Dr. Aftel also stated that Plaintiff could take care of daily activities such as preparing meals and shopping and could manage benefits in her own best interest. (R. at 97-98.) The prognosis for the Plaintiff was poor to guarded. (R. at 98.)

      e.    <u>Medical Report of Dr. Alec Roy</u>

On June 11, 2001, Plaintiff interviewed with Dr. Roy, who conducted a mental state evaluation of Plaintiff. (R. at 101-03.) Dr. Roy described Plaintiff as "a little dysphoric" but not

3

severely depressed. (R. at 102.) Plaintiff's speech and thinking processes were normal. Id. She was fully oriented to time, place, and person and evidenced no memory dysfunction. (R. at 102-03.) Dr. Roy indicated that Plaintiff's GAF score was about 55. (R. at 103.)

    f. Psychiatric Review Technique Form Completed by Dr. Michael A. D'Anton

On July 30, 2001, Dr. D'Anton completed an assessment of the Plaintiff's mental capacities. (R. at 104-17.) Dr. D'Anton concluded that Plaintiff suffered from a non-severe affective disorder characterized by appetite disturbance, sleep disturbance, decreased energy, and depression. (R. at 104-05.) Plaintiff was found to have some functional limitations, including mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace. (R. at 114.)

  2. *Medical Records After August 1, 2001*

    a. Medical Report of Dr. Lester Nadel

On August 22, 2001, Dr. Nadel reported that Plaintiff appeared emotional and was crying at times. (R. at 118.) Plaintiff was able to dress and undress herself and had a normal gait. (R. at 119.) Range of motion in her knee joints was normal. Id. Examination of her head, eyes, ears, nose, throat, and heart were normal. (R. at 118-19.) An EKG and neurological exam were also normal. (R. at 119.) Dr. Nadel noted that Plaintiff was taking multiple medications, including Paxil, Dalmane, Xanax, Risperdal, and Anaprox. (R. at 118.)

    b. Medical Review Referral

On September 27, 2001, a state agency medical consultant reported that there was no evidence of a severe functional impairment due to Plaintiff's knee injury or her endometriosis. (R. at 126.)

      c.    Activities of Daily Living Questionnaire

In November 2001, Plaintiff completed a questionnaire regarding her ability to perform daily living activities. (R. at 77-79.) She stated that she slept a lot because of her medication and her depression. (R. at 77.) There were days she tried to read or use the computer and there were days when she used the bathroom all day long. Id. She claimed that she rarely went out shopping anymore, that she relied on her mother for meals, that she could clean her room depending on how she felt, that her parents took care of her finances, and that she drove alone occasionally within city limits. (R. at 77-78.) She listed her current medications as Depo Provera, Paxil, Ritalin, Xanax, and Elavil. (R. at 78.) Plaintiff stated that she "[felt] trapped in a body that doesn't want to work anymore." (R. at 79.)

      d.    Medical Report of Dr. Gladys Fion

On January 22, 2002, Dr. Fion examined and evaluated Plaintiff. (R. at 153-55.) Dr. Fion stated that Plaintiff's symptoms resulting from endometriosis had gotten worse, with fatigue and chronic pelvic pain nearly incapacitating her. (R. at 153.) Dr. Fion indicated that Plaintiff's past medical history included severe depression and psychosis with suicidal ideation but neither suicidal attempt nor hospitalization for depression. Id. Dr. Fion reported that Plaintiff has suffered from periods of constant vaginal bleeding, anemia, constant diarrhea, bouts of fever, easy crying, panic attacks, weight loss, constant headaches, and severe vomiting when taking injections of Depo Provera. (R. at 154.) Dr. Fion stated that Plaintiff's symptoms include severe pain in the pelvis during her period. Id. Upon physical examination, Dr. Fion found that Plaintiff's gait was not compromised, her heart was rhythmic with no murmurs or clicks, her bowel sounds were normal, her extremities showed no deformities, her deep tendon reflexes

5

were normal, and her range of motion was not limited. (R. at 154-55.) She had no sensory or motor deficits and both cerebellar testing and an electrocardiogram came out normal. (R. at 155.) Dr. Fion also found that Plaintiff had occasional rhonchi in the right base and that her central nervous system was grossly nonfocal. (R. at 154-55.) Dr. Fion's assessment was that Plaintiff was suffering from severe endometriosis with chronic abdominal pain, infertility, and subsequent anemia, as well as severe depression and suicidal ideation but no suicidal attempt. (R. at 155.) Finally, Dr. Fion noted Plaintiff's lack of interest in quitting her smoking habit, which manifested the severity of her depression. Id.

e. Medical Records from the Center for Women's Health

Plaintiff has been receiving treatment at the Center for Women's Health since 1991. (R. at 176.) According to medical records dated October 18, 2001, Plaintiff complained of pelvic pain and irregular menses. (R. at 185.) Dr. Kenneth Kaplan indicated that Plaintiff suffered from endometriosis and prescribed multiple medications including Depo Provera. (R. at 185-86.) Medical records dated October 29,2001, stated that Plaintiff had no vaginal bleeding, had no pelvic pain, slept well, and was doing very well. (R. at 184.) On November 15, 2001, Dr. Kaplan reported that Plaintiff was "doing extremely well on Depo Provera" to the extent that she "[felt] like a different person." (R. at 182.) Medical records dated January 3, 2002, indicated that Plaintiff was experiencing pain again. (R. at 181.) On February 1, 2001, Dr. Kaplan's impression was that Plaintiff was suffering from severe pelvic pain. (R. at 180.) On March 11, 2001, Dr. Kaplan noted that Plaintiff had severe endometriosis and pelvic pain. (R. at 177.) In a letter dated July 22, 2002, Dr. Kaplan stated that "[u]ntil [Plaintiff's] symptoms are improved, there will be some limitations with regard to her work and personal limitations." (R. at 176.)

6

      f.   <u>Hysterectomy</u>

On December 11, 2002, Plaintiff underwent a total abdominal hysterectomy to treat her endometriosis. (R. at 247-48.) Medical records from the hospital indicate that Plaintiff was suffering from severe incapacitating pelvic endometriosis, which had been unresponsive to conservative surgical management and hormonal suppression therapy. (R. at 247.) She tolerated the procedure well and left the operating room in good condition. (R. at 248.)

      *3. Plaintiff's Testimony*

On March 4, 2003, Plaintiff testified at a hearing before ALJ Muehlig. (R. at 260-303.) In response to the ALJ's inquiry as to what happened at her last job, Plaintiff explained that many days she experienced stomach pains for which she received medication. (R. at 264-65.) She stated that her pain reached a point where the doctors did not seem to know what to do anymore. (R. at 266.) She stated that medication did not help her. <u>Id.</u> She stated that her problems with endometriosis began at age seventeen. (R. at 268.) She stated that she underwent three or four operations since that time (R. at 269), but they did not help her. (R. at 267).

Plaintiff testified that even after her hysterectomy she experienced certain pains and had trouble going to the bathroom sometimes. (R. at 292.) She stated that lifting objects would cause her to bleed. (R. at 271.) She stated that from 2001 to the time of her hysterectomy she became progressively worse with terrible pains and fevers. (R. at 271-72.) She stated that she stopped working, at least partly, because her panic attacks made her unable to drive. (R. at 272.) She stated that sometimes she passed out due to the panic attacks. <u>Id.</u> Plaintiff testified that she attempted to drown herself in the sink on one occasion (R. at 299.) She also stated that she used to burn her arms and hands out of frustration and anger. (R. at 300.)

Plaintiff testified that she received counseling from two different psychiatrists from the year 2000 until a few months before the hearing. (R. at 280, 282.) She stated that one of the psychiatrists, Dr. Rizzo, wanted to put her through drug rehabilitation because she was being over medicated, specifically with respect to Oxycontin. (R. at 280-81, 284-85.) She stated that she did not like this suggestion because of the pain she had to deal with on a daily basis. (R. at 286.) Consequently, Plaintiff stopped seeing Dr. Rizzo (R. at 286) and, on her own, eventually stopped taking Oxycontin around December of 2002. (R. at 287).

   *4. Medical Expert's Testimony*

Dr. Martin Fechner, a specialist in internal medicine (R. at 276), also provided testimony at the hearing. Dr. Fechner testified that endometriosis can be quite painful (R. at 277) and that the pain Plaintiff experienced was consistent with the disease. (R. at 278). He stated that a hysterectomy is a last resort for endometriosis. (R. at 277.) He stated that a hysterectomy is a curative procedure in that everything that was causing the problem is removed. Id. He stated that Plaintiff's statements that she was not better after the hysterectomy were disconcerting because if her pain before the hysterectomy was solely attributable to endometriosis then her pain could not be to the extent alleged after the surgery. Id. He stated that, as of the time of hearing, "[t]he endometriosis is pretty much a dead issue." (R. at 290.)

   **C. Decision of the ALJ**

After recounting and analyzing the facts above, ALJ Muehlig determined that Plaintiff was not disabled within the meaning of the Act and therefore denied her application for DIB. (R. at 17-24.) Specifically, the ALJ found that Plaintiff suffered from a combination of severe impairments stemming from a knee injury, endometriosis, depression, and panic attacks. (R.

at18.) However, the ALJ also found that Plaintiff retained the residual functional capacity to perform her past relevant work, as well as the demands of medium work, which requires occasional lifting up to fifty pounds, frequent lifting up to twenty-five pounds, and standing and/or walking up to six hours in an eight-hour workday. (R. at 22.) In reaching this decision, the ALJ refused to give full credit to Plaintiff's subjective complaints in light of the objective medical evidence. (R. at 21.) Finding that the evidence fails to support the full extent of Plaintiff's allegations of disability, the ALJ relied in part on Dr. Fechner's testimony that Plaintiff's hysterectomy should have brought an end to her pain. Id. The ALJ also found no basis for concluding that Plaintiff's mental condition was grounds for a determination of disability. Id. The ALJ noted that Plaintiff had not received any psychiatric treatment for over two years, had never been hospitalized for any mental condition, and had refused to obtain inpatient treatment for prescription medication addiction, contrary to the advice of Dr. Rizzo. Id.

## II.  Standard of Review

### A.  Standard for Entitlement to Benefits under the Act

A claimant is entitled to benefits under the Act only if he satisfies all the relevant requirements of the statute. To establish a valid claim for Disability Insurance Benefits, the claimant must meet the insured status requirements of 42 U.S.C. § 423(c). Furthermore, the claimant must demonstrate that he was disabled within the meaning of the Act.

### B.  Analysis for Determining Disability

Under the Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). Physical or mental impairments are those that "result[] from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). Furthermore, an individual "shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A).

Social Security regulations provide a five-step, sequential evaluation procedure to determine whether a claimant is disabled. 20 C.F.R. § 404.1520. First, the Commissioner must inquire whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is found to be currently engaged in substantial gainful activity, he will be found not disabled without consideration of his medical condition. 20 C.F.R. § 404.1520(b). Second, if the claimant is not engaged in substantial gainful activity, the Commissioner must then decide whether the claimant suffers a severe impairment. 20 C.F.R. § 404.1520(a)(4)(ii). If the impairment is not severe, the claimant will be found not disabled. 20 C.F.R. § 404.1520(c). Third, If the claimant is found to be suffering from a severe impairment, the Commissioner must decide whether the impairment equals or exceeds in severity one of the impairments listed in Appendix I of the regulations. 20 C.F.R. § 404.1520(a)(4)(iii). If the impairment is listed or is the equivalent to a listed impairment, the Commissioner must find the claimant disabled without consideration of other facts. 20 C.F.R. § 404.1520(d). Fourth, if the impairment is not listed, the Commissioner must consider whether the claimant has sufficient

residual functional capacity to perform his past work. 20 C.F.R. § 404.1520(a)(4)(iv). Residual functional capacity is defined as what the claimant "can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1). If a claimant has the residual functional capacity to meet the physical and mental demands of his past work, the Commissioner must find him not disabled. 20 C.F.R. § 404.1520(f). Finally, if the claimant cannot perform any past relevant work, the Commissioner must determine, on the basis of claimant's age, education, work experience, and residual functional capacity, whether he can perform any other work. 20 C.F.R. § 404.1520(a)(4)(v). If he cannot, the Commissioner will find him disabled. 20 C.F.R. § 404.1520(g). The claimant bears the initial burden of proving that his impairment prevents him from returning to past relevant work. Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 118 (3d Cir. 2000). If the claimant satisfies the first four steps, then the burden shifts to the Commissioner to prove the existence of work that exists in significant numbers in the national economy and that the claimant could perform. Id.

### C. Scope of Review

A reviewing court must uphold the Commissioner's factual findings if they are supported by substantial evidence. 42 U.S.C. §§ 405(g), 1383(c)(3); Knepp v. Apfel, 204 F.3d 78, 83 (3d Cir. 2000). Substantial evidence means "more than a mere scintilla." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Perales, 402 U.S. at 401 (quoting Consol. Edison, 305 U.S. at 229). However, substantial evidence "does not mean a large or considerable amount of evidence . . . ." Pierce v. Underwood, 487 U.S. 552, 565 (1988). Substantial evidence may be "less than a

preponderance." Stunkard v. Sec'y of Health & Human Servs., 841 F.2d 57, 59 (3d Cir. 1988).

Some types of evidence will not be "substantial." For example,

> [a] single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence – particularly certain types of evidence (e.g., that offered by treating physicians) – or if it really constitutes not evidence but mere conclusion.

Wallace v. Sec'y of Health & Human Servs., 722 F.2d 1150, 1153 (3d Cir. 1983) (quoting Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983)).

"The substantial evidence standard allows a court to review a decision of an ALJ, yet avoid interference with the administrative responsibilities of the Commissioner." Claussen v. Chater, 950 F.Supp. 1287, 1292 (D.N.J. 1996) (citing Stewart v. Sec'y of Health, Educ. & Welfare, 714 F.2d 287, 290 (3d Cir. 1983)). The standard affords "deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence." Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999). "The inquiry is not whether the reviewing court would have made the same determination, but, rather, whether the Commissioner's conclusion was reasonable." Schonewolf v. Callahan, 972 F. Supp. 277, 284 (D.N.J. 1997) (citing Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988)). Therefore, a court may not "set the Commissioner's decision aside if it is supported by substantial evidence, even if [the reviewing court] would have decided the factual inquiry differently." Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).

The reviewing court has a duty to review the evidence in its totality. Daring v. Heckler, 727 F.2d 64, 70 (3d Cir. 1984). In order to do so, "a court must 'take into account whatever in the record fairly detracts from its weight.'" Schonewolf, 972 F. Supp. at 284 (quoting Willibanks

v. Sec'y of Health & Human Servs., 847 F.2d 301, 303 (6th Cir. 1988)) (internal citation omitted).  The Commissioner has a corresponding duty to facilitate the court's review: "[w]here the [Commissioner] is faced with conflicting evidence, he must adequately explain in the record his reasons for rejecting or discrediting competent evidence."  Ogden v. Bowen, 677 F. Supp. 273, 278 (M.D. Pa. 1987) (citing Brewster v. Heckler, 786 F.2d 581, 584-86 (3d Cir. 1986)).  As the Third Circuit has held, access to the Commissioner's reasoning is essential to a meaningful court review:

> [U]nless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's "duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."

Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978) (quoting Arnold v. Sec'y of Health, Educ. & Welfare, 567 F.2d 258, 259 (4th Cir. 1977) (internal citation omitted)).  Nevertheless, the court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder."  Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992) (citing Early v. Heckler, 743 F.2d 1002, 1007 (3d Cir. 1984)).

**III.  Discussion**

Plaintiff contends that ALJ Muehlig erred as a matter of law by 1) failing to give proper consideration and weight to all of the relevant evidence in the record, 2) failing to support his determination of Plaintiff's residual functional capacity with substantial evidence, and 3) failing to properly evaluate Plaintiff's subjective complaints.[1]  (Pl.'s Br. 1-2.)  For the reasons set forth

---

[1] Plaintiff's complaint alleges that Plaintiff's disability onset date was July 1, 1999. However, the Court will consider only the period beginning August 1, 2001, which is the amended onset date for the period considered at the hearing.

13

below, the Court remands this case for further proceedings consistent with this Opinion.

In finding that Plaintiff retained the capacity to perform her past relevant work, as well as medium work, the ALJ failed to adequately explain his reasons for rejecting certain probative evidence. Although the ALJ points to evidence supportive of his determination of non-disability, he neglects to "take into account whatever in the record fairly detracts from its weight." Indeed, the ALJ in his analysis makes no mention whatsoever of several items of medical evidence conflicting with his assessment. Therefore, "to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Gober, 574 F.2d at 776.

To support his conclusion that Plaintiff had the ability to perform medium work, the ALJ broadly stated that "[supporting] evidence includes the report[] of . . . Dr. Fion," without explaining the relative weight accorded to the various segments of the report. (R. at 22.) Such an explanation is necessary because the report, dated January 22, 2002, can hardly be categorized as wholly supportive of a determination of non-disability. As the ALJ undoubtedly believed, the report does contain findings tending to support a determination of non-disability: Plaintiff's gait was not compromised, her heart was rhythmic with no murmurs or clicks, her bowel sounds were normal, her extremities showed no deformities, her deep tendon reflexes were normal, her range of motion was not limited, she had no sensory or motor deficits, and both cerebellar testing and an electrocardiogram came out normal. However, the ALJ's analysis ignored evidence tending to support a determination that Plaintiff may have been disabled. For example, Dr. Fion stated that Plaintiff's symptoms had gotten worse, with fatigue and chronic pelvic pain nearly incapacitating her. Dr. Fion also stated several other symptoms: periods of constant vaginal bleeding, anemia,

constant diarrhea, bouts of fever, easy crying, panic attacks, weight loss, constant headaches, and severe vomiting when taking injections of Depo Provera.  Dr. Fion's ultimate assessment was that Plaintiff was suffering from severe endometriosis with chronic abdominal pain, infertility, and subsequent anemia, as well as severe depression and suicidal ideation but no suicidal attempt.  Although the ALJ may have, in his own mind, considered Dr. Fion's reports as a whole, whether he actually did so cannot be determined from the record.

Furthermore, the ALJ did not explain the weight given to medical records from the Center for Women's Health, where Plaintiff was treated by Dr. Kaplan.  These records, particularly those from January 2002 and afterwards, arguably conflict with a non-disability determination and are consistent with Dr. Fion's assessment of severe endometriosis.  According to Dr. Kaplan, Plaintiff was doing very well as of November 15, 2001.  However, on January 3, 2002, records indicate that Plaintiff began experiencing pain again.  On February 1, Dr. Kaplan reported that Plaintiff was suffering from severe pelvic pain.  On March 11, Dr. Kaplan noted that Plaintiff had severe endometriosis and pelvic pain.  On July 22, 2002, Dr. Kaplan stated that "[u]ntil [Plaintiff's] symptoms are improved, there will be some limitations with regard to her work and personal limitations."  The Court does not address whether this medical evidence is substantial enough to support a finding of disability.  However, even if the ALJ rightly concluded that Plaintiff was not disabled, the ALJ has a duty to consider and explain the weight given to this evidence.  Such consideration is absent from the ALJ's decision.

In evaluating the medical evidence discussed above, it is essential to remember the temporal requirement for disabilities under the Act: the disability must "[have] lasted or [is] expected to last for a *continuous period of not less than 12 months*."  Here, assuming that

Plaintiff meets the standard for disability under the Act, the ALJ must determine whether that disability continued for a period of at least twelve months. The answer is not clear from the record.

Plaintiff's onset date of her alleged disability is August 1, 2001. Between August 1, 2001 and November 15, 2001, the evidence suggests that Plaintiff was relatively well. The medical report of Dr. Nadel, dated August 22, 2001, states that Plaintiff could dress and undress herself, had a normal gait, had normal range of motion in her knee joints, and checked out okay in an examination of her head, eyes, ears, nose, throat, and heart. On September 27, a state agency medical consultant reported that Plaintiff's symptoms evidenced no severe functional impairment. Medical records from the Center for Women's Health, dated October 18, revealed that Plaintiff complained of pelvic pain and irregular menses. Medical records dated October 29, however, stated that Plaintiff had no vaginal bleeding, had no pelvic pain, slept well, and was doing very well. On November 15, Dr. Kaplan reported that Plaintiff was "doing extremely well on Depo Provera" to the extent that she "[felt] like a different person."

Records from the Center for Women's Health, dated January 3, 2002, indicate that Plaintiff was experiencing pain again. On February 1, Dr. Kaplan's impression was that Plaintiff was suffering from severe pelvic pain. On March 11, Dr. Kaplan noted that Plaintiff had severe endometriosis and pelvic pain. On July 22, Dr. Kaplan stated that "[u]ntil [Plaintiff's] symptoms are improved, there will be some limitations with regard to her work and personal limitations." Dr. Fion's report, dated January 22, 2002, is consistent with Dr. Kaplan's records. Dr. Fion remarked that fatigue and chronic pelvic pain was nearly incapacitating Plaintiff. Dr. Fion listed several symptoms: periods of constant vaginal bleeding, anemia, constant diarrhea, bouts of

fever, easy crying, panic attacks, weight loss, constant headaches, and severe vomiting when taking injections of Depo Provera. Dr. Fion's ultimate assessment was that Plaintiff was suffering from severe endometriosis with chronic abdominal pain, infertility, and subsequent anemia, as well as severe depression and suicidal ideation but no suicidal attempt.

Assuming that Plaintiff's pain continued to persist until she underwent a total hysterectomy, a curative procedure according to Dr. Fechner, the earliest her symptoms should have stopped was December 11, 2002, the date of the hysterectomy. Dr. Fechner suggested that pain during the first month after surgery would be understandable because of the recovery period. (R. at 278.) However, he stated that by the time of the hearing, March 4, 2003, the symptoms from the endometriosis should not be a problem anymore. Therefore, according to Dr. Fechner, Plaintiff's symptoms from endometriosis should have ceased sometime between December 11, 2002 and March 4, 2003. Based on the medical evidence discussed above, Plaintiff began experiencing the pain that led to her hysterectomy sometime between November 15, 2001 and January 3, 2002.[2] If Plaintiff is found to be disabled at any point between these dates, then the next question is whether that disability continued for a period of at least twelve months. The answer depends on the dates discussed above.

In sum, on remand, the ALJ must first determine whether Plaintiff was under a disability within the meaning of the Act by considering all relevant evidence. This includes the portions of Dr. Fion's report discussed above and the records from the Center for Women's Health. Next, if the ALJ finds that Plaintiff was disabled, then he must determine whether the disability

---

[2]This assumes that any continuous period of disability was broken as of November 15, 2001, when Dr. Kaplan reported that Plaintiff was "doing extremely well" and that she "[felt] like a different person." Plaintiff was also reported to be doing very well as of October 29, 2001.

17

continued for a period of at least twelve months.

**IV.  Conclusion**

For the reasons stated above, the Commissioner's decision is remanded for further proceedings consistent with this Opinion.  An appropriate Order shall issue this same day.


Date:  March 31, 2006
Orig:  Clerk's Office
cc:    All parties
       File

                                      S/   Dennis M. Cavanaugh
                                      DENNIS M. CAVANAUGH, U.S.D.J.